**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **BARRY RANDALL THOMAS,** | ) | |
| **AIS NO. 178628**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:07-cv-00630-MEF-WC** |
| | ) | |
| **DR. DARBOUZE, NURSE WILSON,** | ) | |
| **AND WARDEN DAVENPORT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

─────────────────────────────────────────────────────────────

### RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

─────────────────────────────────────────────────────────────

COME NOW, Defendants DR. JEAN DARBOUZE ("Dr. Darbouze") and KAY WILSON, RN ("Nurse Wilson" or collectively with Dr. Darbouze, the "Medical Defendants") in response to the Motion for Preliminary Injunction filed by Plaintiff BARRY RANDALL THOMAS ("Plaintiff") and pursuant to the Court's Order dated August 9, 2007, and respectfully request that this Court deny Plaintiff's Motion for Preliminary Injunction based upon the evidence and legal authorities identified herein. Contemporaneously with this Response, Medical Defendants submit their Evidentiary Submission in support of this Response to Plaintiff's Motion for Preliminary Injunction, including the affidavits of Dr. Darbouze, Nurse Wilson and Beth H. Long together with material excerpts from Plaintiff's medical records attached thereto.

### INTRODUCTION

Plaintiff's Motion for Preliminary Injunction fully demonstrates why medical decisions and medical judgment pertaining to the diagnosis and treatment of inmate's medical conditions

should not become an issue of court intervention. Plaintiff's complaints of back pain most recently arose approximately three (3) months ago. The undisputed evidence demonstrates that Dr. Darbouze has conducted diagnostic and lab testing on Plaintiff in addition to numerous examinations of Plaintiff's physical condition which have revealed that the only current medically identifiable cause of Plaintiff's back pain is muscular pain. Furthermore, Nurse Wilson has not been involved in meaningful fashion in the diagnosis and/or treatment of Plaintiff's back pain. As demonstrated below, Plaintiff has failed to provide the Court with any evidence or legal justification for the issuance of a preliminary injunction and, as such, his Motion for Preliminary Injunction is due to be denied.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

### A.    PROCEDURAL HISTORY

Plaintiff instituted this action against Dr. Darbouze[1] and Nurse Wilson[2] as well as numerous other officers and officials of the Alabama Department of Corrections (collectively, the "Correctional Defendants") on or about July 10, 2007. (See Complaint). As Plaintiff states in his Complaint, he "is an inmate in the custody of the Alabama Department of Corrections and is currently incarcerated at Easterling Correctional Facility ["Easterling"] in Clio, Alabama." (Complaint at ¶ 4). Plaintiff's Complaint arises solely out of his disagreement with the course of

---

[1]    Dr. Darbouze has been a licensed physician in Alabama since 1996 and has been board certified in internal medicine since 1997. (Darbouze Aff. at ¶ 2). From February of 2000 through February of 2004, and again from April 16, 2004 through the present Dr. Darbouze has served as the Medical Director for Easterling. (Id.).

[2]    Nurse Wilson has been a licensed, registered nurse in Alabama since 1985. (Wilson Aff. at ¶ 2). She holds a Bachelor's Degree in nursing from Troy State University. (Id.). In particular, Nurse Wilson has worked as a nurse at Easterling, since March of 2001. (Id.). Since November 3, 2003, she has been employed as the Health Services Administrator ("H.S.A".) for Easterling. (Id.).

medical treatment provided by the medical staff at Easterling in response to his complaints of back pain. (See Complaint).

With regard to his alleged back condition, Plaintiff claims his discomfort began "in about 94-95." (Complaint at ¶ 10). According to Plaintiff's Complaint[3], Plaintiff did not complain about back pain again until November 6, 2005, in which he stated his back pain became "intolerable, acute, extreme and chronic . . . radiating like electricity into his legs . . ." (Complaint at ¶ 10). Since November 6, 2005, Plaintiff claims that he has submitted "several 'sick call' slips" regarding his alleged back pain. (Complaint at ¶ 10).

Plaintiff claims that he saw Dr. Darbouze "several times" and received the medications Motrin and Flexeril. (Complaint at ¶ 12). With regard to his inclusion of Nurse Wilson in this action, Plaintiff merely states, "Nurse Wilson has seen the Plaintiff at H.C.U., and received his grievance and spoken to him about his condition." (Complaint at ¶ 13).

Plaintiff explicitly states that his claims against the Medical Defendants are limited to his claim of deliberate indifference brought pursuant to "42 U.S.C. Section 1983." (Complaint at ¶ 2). Specifically, Plaintiff writes, "[t]he deliberate indifference by Defendants to Plaintiff's serious medical need resulted in continued pain, suffering, and physical degradation of Plaintiff's condition depriving him of his rights under due process clause of the Fourteenth Amendment and Eighth Amendment of the U.S. Constitution." (Complaint at ¶ 20). Plaintiff also alleges that "the medical defendants' fail[ed] to inquire into facts necessary to make a professional judgment;

---

[3]     Plaintiff attempts to offer the Affidavit of another inmate at Easterling Correctional Facility by the name of Andrew Jackson Smith. (See Complaint, Smith Aff.). Smith includes various "credentials" in his purported affidavit, but fails to submit any documentation which demonstrates in any way that he is licensed to practice medicine in the state of Alabama or is otherwise authorized in any way to offer any expert opinion regarding Plaintiff's medical conditions and/or conduct inappropriate evaluation of Plaintiff's symptoms, conditions and/or other potential problems. (Id.).

[provided] inadequate medical evaluations; and deni[ed Plaintiff] to access a specialist qualified to address the Plaintiff's needs . . . ." (Complaint at ¶ 24).

On or about July 10, 2007, Plaintiff filed a "Motion for Preliminary Injunction" in which he sought immediate court intervention with regard to his purported back condition. In his Motion for Preliminary Injunction, Plaintiff expresses concern regarding his current back condition and that such purported condition may "worsen" without injunctive relief. (Motion for Preliminary Injunction at ¶ 2). According to Plaintiff, he is seeking "in essence an order compelling Defendants to perform their pre-existing duties under the U.S. Constitution." (Motion for Preliminary Injunction at ¶ 3). More specifically, Plaintiff requests in his Motion for Preliminary Injunction "adequate means of aid to mobility (such as wheelchair, walker, and/or cane)" to have Plaintiff evaluated by a specialist and his treatment adhere to; issue profiles as meed [sic] permit jailhouse lawyer assistance and no retaliation." (Motion for Preliminary Injunction at p. 3).

In the Memorandum submitted in support of his Motion for Preliminary Injunction, Plaintiff claims that his condition has "deteriorated from a point of normal ambulation [sic] to a contorted posture, inability to ambulate and acute chronic pain preventing him from engaging in meaningful activities of daily living." (Memorandum in Support of Motion for Preliminary Injunction at p. 3). According to Plaintiff, "Dr. Darbouze has failed to make any diagnosis in the case and Plaintiff upon information and belief notes the doctor's frequent remark that 'nothing is wrong' and that Plaintiff is 'faking.'" (Memorandum in Support of Motion for Preliminary Injunction at p. 4). Though Plaintiff claims that Dr. Darbouze does not possess sufficient "specialized training" to diagnose and/or evaluate Plaintiff's medical conditions, he fails to identify any specific authority which demonstrates that in this instance Dr. Darbouze is not

properly trained in order to make the necessary evaluation of Plaintiff's medical condition. (Memorandum in Support of Plaintiff's Motion for Preliminary Injunction at p. 4). Though Plaintiff claims that "[t]he physician must inquire sufficient lead to make a professional judgment," he does not state what additional inquiry is required. (Memorandum in Support of Plaintiff's Motion for Preliminary Injunction at p. 6). Plaintiff further alleges that he "requires additional tests for a diagnosis," but fails to identify what additional "tests" are required. (Memorandum in Support of Plaintiff's Motion for Preliminary Injunction at p. 6).

        **B.**     **THE SICK CALL PROCESS AT EASTERLING CORRECTIONAL FACILITY**

When an inmate has a non-emergency medical or health problem and/or complaint, an inmate may file a sick call request form in order to bring this problem or complaint to the attention of the medical staff at Easterling and/or request medical treatment for this problem. (Wilson Aff. at ¶ 5). The sick call request process is well-known at Easterling and is utilized by inmates at Easterling on a daily basis. (Id.). When an inmate first arrives at Easterling, he is taken to the Health Care Unit to be processed into the system and receives an orientation as to the availability of medical services at the facility as well as the procedures for obtaining medical care. (Id.). During this orientation, the medical staff gives each inmate an information sheet and verbally goes through the sheet with newly-arriving inmates, informing them how to utilize the sick call request form process. (Id.). Sick call request forms are available in the Health Care Unit at the shift commander's station or may be obtained from the Alabama Department of Corrections ("ADOC") officer in each dorm at Easterling. (Id.).

An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature) and submit the sick call request form by

placing it in a locked box located outside the facility's kitchen (i.e., chow hall). (Id.). The sick call request forms are removed from the locked box each day and brought to the Health Care Unit. (Id.). Upon retrieving the sick call request forms, the medical staff compiles a list of inmates having submitted a sick call request form, which is sent to the various dorms at Easterling. (Id.). Easterling conducts sick call five (5) times per week, Sunday through Friday excluding holidays or unexpected emergencies. (Id.). Sick call begins at 7:00 p.m. and lasts as long as required to examine all the inmates who report to sick call. (Id.). Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints at the time they are summoned to the Health Care Unit for sick call. (Id.). The number of inmates reporting to sick call each day varies between approximately ten (10) and thirty-five (35). (Id.). The nurse conducting sick call takes reporting inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Easterling. (Id.). If the inmate fails to report to sick call when summoned, this is often indicated in the sick call request form because it is left blank by the medical staff. (Id.). If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the infirmary (located within the Health Care Unit) and the inmate will be examined and treated by a physician. (Id.).

### C. MEDICAL TREATMENT PROVIDED TO PLAINTIFF.

The first reference in Plaintiff's medical records regarding any complaints of lower back pain occurred in 1995. (Darbouze Aff. at ¶ 4; PHS051). Plaintiff submitted a sick call request form dated January 18, 1995, writing, "pain in lower back for past three days" while he was incarcerated at Bullock Correctional Facility. (Id.). Plaintiff was evaluated the following day by

the medical staff and was provided with pain medication and muscle relaxers. (Id.). The medical staff at Bullock Correctional Facility specifically noted that an examination of Plaintiff on January 19, 1995, indicated that Plaintiff likely pulled a muscle in his back. (Darbouze Aff. at ¶ 4 and PHS052). After this January 19, 1995, episode of back pain, Plaintiff's complaints ceased completely. (Darbouze Aff. at ¶ 4).

Plaintiff submitted sick call request forms or other similar forms for non-urgent medical attention on July 18, 1996, July 24, 1996, July 25, 1996, August 8, 1996, January 1, 1997, November 2, 1997, January 6, 1998, August 5, 1998, November 29, 1998, January 31, 2001, July 15, 2002, October 14, 2002, October 19, 2002, April 6, 2003, and April 9, 2003. (Darbouze Aff. at ¶ 5 and PHS028, 30, 32, 33, 35, 36, 40, 42, 43, 45, 46, 47, 48, 50, 84-88). As late as April of 2005, Plaintiff attended sick call for other medical complaints, but did not mention any complaints regarding back pain or any other issues with regard to his back. (Darbouze Aff. at ¶ 5 and PHS013). As confirmed in his medical records, Plaintiff did not mention any complaints of back pain for over ten (10) years, i.e. between January 19, 1995, and November 12, 2005. (Darbouze Aff. at ¶ 5 and PHS025, 28, 30, 32, 33, 35, 36, 40, 42, 43, 45, 46, 47, 48, 50, 84-88).

Plaintiff completed a sick call request form dated November 13, 2005, complaining of lower back and left hip pain. (Darbouze Aff. at ¶ 6 and PHS025). After submitting his November 13, 2005, sick call request form, Plaintiff was evaluated by the medical staff at Easterling. (Darbouze Aff. at ¶ 6 and PHS026). After examining Plaintiff, the medical staff was noted that he did not have any physical injuries or obvious signs of trauma to his lower back. (Id.). Plaintiff was referred to Dr. Darbouze for further evaluation and given a prescription for Tylenol. (Id.).

Dr. Darbouze examined Plaintiff on November 18, 2005. (Darbouze Aff. at ¶ 7 and PHS013). During this examination, Plaintiff complained of lower back pain, but denied any weakness, any prior surgeries and/or prior trauma which would in any way cause the complained of back pain. (Id.). Upon examining Plaintiff, Dr. Darbouze only discovered mild muscular tenderness in Plaintiff's lower back and did not note any symptoms or signs which would indicate any type of neurological or other structural defect in Plaintiff's lower back. (Id.). After examining Plaintiff, Dr. Darbouze ordered that he undergo an x-ray of his lower spine, receive 10 mg of Flexeril three times a day for one week, Tylenol three times a day or as needed for two weeks and Feldene once a day in the evening for fourteen days. (Darbouze Aff. at ¶ 7 and PHS005, 13, 58). Feldene is a non-steroidal anti-inflammatory medication often utilized to reduce pain, swelling and/or stiffness associated with muscular strains, pain and discomfort. (Darbouze Aff. at ¶ 7). In a physician's order dated November 18, 2005, Plaintiff was also instructed to avoid prolonged standing. (Darbouze Aff. at ¶ 7 and PHS005, 111).

Plaintiff underwent an x-ray of his lumbar spine on November 21, 2005. (Darbouze Aff. at ¶ 8). The results of the November 21, 2005, x-ray demonstrated that, "**[t]he vertebrae are well aligned and show no evidence of any fracture or any destructive bone disease**." (Darbouze Aff. at ¶ 8 and PHS083).

Dr. Darbouze examined Plaintiff again on December 9, 2005. (Darbouze Aff. at ¶ 9 and PHS009). He noted that his lower back pain had not greatly improved and, in fact, worsened after prolonged periods of time standing. (Darbouze Aff. at ¶ 9 and PHS009). Plaintiff requested during the December 9, 2005, appointment that Dr. Darbouze provide him with a profile[4] allowing him to sit when necessary and directing the correctional staff to allow him to avoid

---

[4]    A "profile" is an order provided by the site physician which allow an inmate to deviate from the standard operating procedures at Easterling. (Wilson Aff. at ¶ 6).

prolonged periods of standing. (Id.).  In response to this request, Dr. Darbouze provided the requested prolonged standing profile as well as medication (Percogesic, Motrin) and topical cream (Bengay) intended to alleviate his muscular discomfort.  (Darbouze Aff. at ¶ 9 and PHS009, 56-57, 110).  After this November, 2005, episode of back pain, there were no further complaints of back pain from Plaintiff for approximately 18 months, i.e. until May of 2007. (Darbouze Aff. at ¶ 9).  **As such, Plaintiff's most recent complaints of back pain did not start until approximately 3 months ago**. (Darbouze Aff. at ¶¶ 9-10 and PHS024).

In a sick call request form dated May 2, 2007, Plaintiff noted that his lower back pain continued but requested information as to whether there was a "different treatment" or whether the medical staff could "schedule a more sensitive exam – CT or MRI?" (Darbouze Aff. at ¶ 10 and PHS024).  Plaintiff was summoned to the health care unit on May 3, 2007, for sick call, but he failed to appear. (Darbouze Aff. at ¶ 10 and PHS101).  When Plaintiff underwent his yearly examination on May 11, 2007, the medical staff did note that Plaintiff complained of episodes of "sciatica," but could not identify any specific cause of his back pain. (Darbouze Aff. at ¶ 10 and PHS126).

Plaintiff completed a sick call request form dated May 13, 2007, in which he again complained of "lower back and left leg pain." (Darbouze Aff. at ¶ 11 and PHS022).  When Plaintiff reported his sick call on May 13, 2007, Plaintiff stated "my sciatic nerve is bothering me" and informed medical staff that it had been causing pain for approximately "2 months." (Darbouze Aff. at ¶ 11 and PHS023).  The Easterling medical staff examined Plaintiff during the May 13, 2007, sick call and noted that Plaintiff walked evenly with a steady gait and complained only of dull, or aching pain to his left lower back. (Id.).  At the conclusion of the May 13, 2007,

sick call, Plaintiff received 600 mg of Motrin and was referred to Dr. Darbouze for further evaluation. (Darbouze Aff. at ¶ 11 and PHS023, 055).

Dr. Darbouze examined Plaintiff again on May 15, 2007, during which Plaintiff voiced complaints of lower back pain. (Darbouze Aff. at ¶ 12 and PHS012). During the May 15, 2006, examination, Plaintiff did not exhibit any symptoms of any particular spinal condition or disease, only complaining and demonstrating muscle tenderness in the left side of his left back. (Id.). At the conclusion of the May 15, 2006, examination, Dr. Darbouze prescribed Motrin and Flexeril three times a day for Plaintiff and also directed Plaintiff to utilize only a bottom bunk. (Darbouze Aff. at ¶ 12 and PHS012, 55). Plaintiff received a bottom bunk profile from May 15, 2007, through May 30, 2007. (Darbouze Aff. at ¶ 12 and PHS100).

Plaintiff complained of continuing back pain in a sick call request form dated May 28, 2007. (Darbouze Aff. at ¶ 13 and PHS021). On May 28, 2007, Plaintiff complained that he was unable to put any pressure on his left leg and was immediately brought to the health care unit for evaluation. (Darbouze Aff. at ¶ 14 and PHS099). After being examined by the medical staff at approximately 8:45 a.m. on May 28, 2007, Plaintiff was moved to the infirmary for observation by the medical staff. (Id.). The medical staff noted that after Plaintiff was admitted to the infirmary on the morning of May 28, 2007, he was able to walk around the infirmary with assistance. (Id.). By 12:10 p.m. on May 28, 2007, Plaintiff stated that he felt "better" and that "the pain comes and goes." (Id.). Plaintiff was released from the infirmary at approximately 12:10 p.m. on May 28, 2007, and was encouraged to remain compliant with his medications. (Id.).

He submitted a second sick call request form dated two days later, in which he complained of continuing back pain and stated that his existing medications, including "pain

medications and muscle relaxers," were not "alleviating symptoms." (Darbouze Aff. at ¶ 13 and PHS019). Plaintiff was evaluated by the medical staff on May 30, 2007, in which he also complained of lower back pain. (Darbouze Aff. at ¶ 15 and PHS020). During the sick call on May 30, 2007, Plaintiff complained that his back pain had only existed for "3 months." (Id.). At the conclusion of sick call, Plaintiff refused additional medication and was referred to Dr. Darbouze. (Id.). Dr. Darbouze provided Plaintiff with a bottom bunk profile, instructing him only to utilize a bottom bunk, beginning on May 30, 2007. (Darbouze Aff. at ¶ 15 and PHS004).

Dr. Darbouze examined Plaintiff on June 5, 2007, and this examination only revealed continuing muscular tenderness in Plaintiff's lower back pain. (Darbouze Aff. at ¶ 16 and PHS012). Dr. Darbouze continued Plaintiff's prescriptions for Motrin, Flexeril and Bengay as well as Plaintiff's order to utilize only a bottom bunk. (Darbouze Aff. at ¶ 16 and PHS004, 12, 53, 96).

When Dr. Darbouze examined Plaintiff on June 8, 2007, Plaintiff complained of continuing back pain, but did not demonstrate any tenderness in any bony section of his spine, only complaining of tenderness in the muscular section of his lower back. (Darbouze Aff. at ¶ 17 and PHS011, 95). At the conclusion of the June 8, 2007, examination, Dr. Darbouze concluded that there was no specific cause of Plaintiff's continued back pain other than muscular tenderness. (Darbouze Aff. at ¶ 17 and PHS011, 95).

Plaintiff received orders to undergo an x-ray of his lower spine as well as crutches on June 8, 2007. (Darbouze Aff. at ¶ 18 and PHS004). Plaintiff underwent an x-ray of his lumbar spine on June 12, 2007. (Darbouze Aff. at ¶ 18 and PHS082). The board-certified radiologist who reviewed the x-ray results of Plaintiff's June 12, 2007, study, concluded as follows, "[t]he

vertebrae are well aligned and show no evidence of any fracture or other destructive bone disease." (Darbouze Aff. at ¶ 18 and PHS082).

On June 13 and 17, 2007, Plaintiff submitted a sick call request forms in which he complained of continued back pack. (Darbouze Aff. at ¶ 19 and PHS016, 18). Plaintiff failed to report to sick call on June 14, 2007, when he was summoned to the healthcare unit for examination. (Darbouze Aff. at ¶ 19 and PHS092). When presented with the "release of responsibility" form, Plaintiff refused to sign the document acknowledging his refusal to attend sick call. (Id.). Plaintiff acknowledged receipt of crutches from the medical staff at Easterling on June 15, 2007. (Darbouze Aff. at ¶ 20 and PHS093).

Plaintiff was evaluated by the medical staff again on June 20, 2007. (Darbouze Aff. at ¶ 21 and PHS017). The medical staff noted that, during the June 20, 2007, sick call, Plaintiff walked to the health care unit without any assistance, was able to stand and walk with a slow, steady gait and demonstrated some reduced range of motion. (Id.). However, during the June 20, 2007, sick call, Plaintiff's focused primarily on his request for certain "profiles." (Id.). On June 20, 2007, Plaintiff was referred to Dr. Darbouze for further evaluation. (Id.).

Plaintiff was examined by a member of the medical staff on June 22, 2007, and admitted that he had refused an appointment with Dr. Darbouze. (Darbouze Aff. at ¶ 22 and PHS015, 91). On June 25, 2007, the medical staff moved Plaintiff to the infirmary at Dr. Darbouze's direction for observation and to ensure that he received any assistance necessary from the medical staff at Easterling. (Darbouze Aff. at ¶ 22 and PHS004). Though Plaintiff complained of continued lower back pain and left leg pain during a June 25, 2007, examination, the examination by a member of the medical staff did not reveal any specific causes of his lower back pain. (Darbouze

Aff. at ¶ 22 and PHS015). Plaintiff later received a prescription for 400 mg of Motrin two times a day on June 26, 2007. (Darbouze Aff. at ¶ 22 and PHS004).

When examined by the medical staff on June 26, 2007, Plaintiff complained of continuing lower back pain and, when asked when his back pain began, he stated that he "just woke up one day with back pain." (Darbouze Aff. at ¶ 23 and PHS011). At the conclusion of the June 26, 2007, examination, Plaintiff was instructed to continue his medication regiment as ordered by Dr. Darbouze.  (Darbouze Aff. at ¶ 23 and PHS011, 53).

On June 28, 2007, Dr. Darbouze examined Plaintiff and noted that Plaintiff was utilizing a crutch and favoring his left side. (Darbouze Aff. at ¶ 24 and PHS010).  During the June 28, 2007, examination, Plaintiff was able to bend over and touch his toes though he persistently protected his left side. (Id.).  His medical records clearly recite that, during the June 28, 2007, examination, Plaintiff complained of lower back pain, but did not show any tenderness in his sciatic notch or any type of muscle spasms which would indicate any specific cause for his back pain. (Id.).  At the conclusion of the June 28, 2007, examination, Dr. Darbouze noted that there was no objective way to determine if the pain complained of by Plaintiff was "really that intense or a true problem/complaint." (Id.).  Following the June 28, 2007, examination, Dr. Darbouze made minor changes to Plaintiff's medication regiments. (Id.).

After evaluating Plaintiff on June 28, 2007, Dr. Darbouze discontinued Plaintiff's prescription for Motrin and Flexeril and ordered Plaintiff to take Naprosyn and Robaxin. (Darbouze Aff. at ¶ 25 and PHS003).  All of these medications are commonly prescribed for individuals with recurrent or significant muscular discomfort or pain. (Darbouze Aff. at ¶ 25). Naprosyn, also known as Naproxen, is a form of ibuprofen which is commonly used for muscular pain. (Id.).  Robaxin, like Flexeril is a muscle relaxer, which is commonly prescribed

for those individuals who suffer from any sort of chronic muscular pain. (Id.). Dr. Darbouze also ordered Plaintiff to be housed in the infirmary for a period of approximately four days, be allowed to utilize crutches for approximately a week and remain in bed to the extent possible except for the occasions when he needed to leave his bed for medication administration and meals. (Darbouze Aff. at ¶ 25 and PHS003).

Dr. Darbouze examined Plaintiff on July 2, 2007, noting some tenderness in Plaintiff's lower spine, but also noting that the x-ray of Plaintiff's lower spine was negative. (Darbouze Aff. at ¶ 27 and PHS008). During this examination, Dr. Darbouze provided him with a prescription for crutches for one week, Tylenol three times a day for two weeks and the muscle relaxer, Flexeril, three times a day for two weeks. (Darbouze Aff. at ¶ 27 and PHS002). Dr. Darbouze also ordered Plaintiff to undergo another x-ray of his lower spine as well as his left and right hips, which also failed to reveal any abnormalities, trauma or other injury or complications with regard to Plaintiff's lower back. (Darbouze Aff. at ¶ 27 and PHS002 - 3). Plaintiff signed a "receipt of medical equipment/appliance form" on July 2, 2007, acknowledging his receipt of crutches. (Darbouze Aff. at ¶ 27 and PHS089 and 90).

An x-ray was taken of Plaintiff's lumbar spine on July 2, 2007. (Darbouze Aff. at ¶ 28 and PHS073). Though the July 2, 2007, x-ray revealed "slight scoliosis" of Plaintiff's spine, the radiologist reviewing the x-ray results determined that there was no "disk space narrowing" or "evidence of recent fracture or other significant bony abnormality." (Darbouze Aff. at ¶ 28 and PHS073). Based upon the findings of this x-ray, it remains possible that Plaintiff eschewed the results of this x-ray by bending in a particular direction or not have appropriate posture during the x-ray. (Darbouze Aff. at ¶ 28).

Based upon the numerous examinations of Plaintiff, the various diagnostic and imaging testing completed regarding his complaints of back pain, Dr. Darbouze remains confident that his back pain is muscular in origin. (Darbouze Aff. at ¶ 29). Dr. Darbouze's examinations of Plaintiff have not revealed any skeletal or neurological problems which would indicate that his back pain is caused by a malformation or disease of his spine. (Id.). At present, the only objective medical findings available to Dr. Darbouze constitute Plaintiff's x-ray results. (Id.). These x-ray results have been persistently normal, though the most recent results indicate some "slight" scoliosis which would not result in the type of pain described by Plaintiff. (Id.).

In the field of medicine, there is no objective way to test a patient to confirm that he or she is experiencing pain. (Id.). In certain instances, extreme pain can be confirmed through tests such as blood pressure tests, but the evaluations of Plaintiff have not shown an fluctuation of his vital signs which would indicate that he is in any degree of traumatic or significant pain to such a degree. (Id.). Ultimately, a physician is required to rely upon a patient in many instances to accurately describe pain and discomfort and is without any ability to confirm a patient's subjective descriptions of pain. (Id.).

In the case of Plaintiff, Dr. Darbouze does not believe that there are any additional diagnostic or imaging tests which would be beneficial to Plaintiff at this time. (Darbouze Aff. at ¶ 30). Likewise, Dr. Darbouze is not aware of any additional medical treatment of any kind that may be provided by any other physician or specialist which would remedy Plaintiff's discomfort. (Id.). Dr. Darbouze's examinations of him have confirmed his conclusion that his pain is primarily, if not entirely, muscular in nature. (Id.). Dr. Darbouze has not denied Plaintiff any necessary medical treatment or ignored his complaints to Dr. Darbouze. (Id.). Dr. Darbouze has examined Plaintiff on a regular basis and will continue to do so in the future. (Id.). Dr. Darbouze

has attempted to control his pain through medication and will continue to do so in the future. (<u>Id.</u>). Dr. Darbouze is vigilantly attempting to monitor any changes in his condition and, if such changes occur, he will respond in a timely fashion and provide all necessary medical attention and care. (<u>Id.</u>). Plaintiff's condition at this time appears to be an instance when future care will depend, in large part, upon the manner in which his condition changes or improves. (<u>Id.</u>). Given the history of his back pain, it remains possible that his condition will be remedied over time. (<u>Id.</u>).

### D. NURSE WILSON'S LACK OF INVOLVEMENT IN THE TREATMENT OF PLAINTIFF'S ALLEGED BACK CONDITION.

As a registered nurse at Easterling, Nurse Wilson is not authorized to provide or order prescription medication for any inmate unless authorized to do so by a physician. (Wilson Aff. at ¶ 4). Likewise, she is not authorized to diagnose any medical condition suffered by Plaintiff and, in particular, she is not authorized or qualified to consider his complaints of back pain or identify the cause of his complaints of back pain. (<u>Id.</u>). Such decisions or conclusions must be made by his attending physician. (<u>Id.</u>). For these reasons, Nurse Wilson has not at any time attempted to diagnose the cause of Plaintiff's complaints of back pain. (<u>Id.</u>).

Nurse Wilson's involvement with the complaints made by Plaintiff and the attempts by the medical staff at Easterling to identify the cause of his complaints of back pain has been limited to providing responses to one grievance form completed by Plaintiff and received by Nurse Wilson in June of 2007. (Wilson Aff. at ¶ 6). In the grievance form completed by Plaintiff, he complained of back pain and requested a wheelchair and an appointment with a specialist. (<u>Id.</u>). Plaintiff also requested "profiles," which are orders provided by the site physician which allow an inmate to deviate from the standard operating procedures at Easterling. (<u>Id.</u>). In particular, Plaintiff requested a profile from the site physician which ordered him to

avoid standing or working and allowed him to use the handicap-accessible shower facility at Easterling. (Id.). As an RN, Nurse Wilson is not authorized to determine whether Plaintiff's medical complaints justified the issuance of the profiles he requested. (Id.). When Nurse Wilson received Plaintiff's first grievance, she promptly reviewed his file and noted that he had been evaluated by Dr. Darbouze within the last week and that Plaintiff had received crutches and a bottom bunk profile from Dr. Darbouze during his last appointment. (Id.). Nurse Wilson also confirmed that Plaintiff had recently submitted a sick call request form and was scheduled for evaluation during the upcoming sick call. (Id.). Given Nurse Wilson's review of his medical records and the notes from his recent appointment with Dr. Darbouze, it did not appear to Nurse Wilson that Plaintiff's back pain was a medical emergency at that time or that there was anything additional that Nurse Wilson could contribute to the treatment of his back pain, which was not being provided and/or would be provided at the upcoming sick call. (Id.).

Approximately 10 days after Nurse Wilson received Plaintiff's grievance, the medical staff received a grievance appeal from Plaintiff, in which he continued to complain of back pain. (Id.). Nurse Wilson neither received nor reviewed this grievance and was not involved in evaluating the complaints made by Plaintiff in this grievance appeal. (Id.). Another member of the medical staff at Easterling evaluated this grievance appeal, reviewed his medical records and provided a response. (Id.).

Nurse Wilson has not been responsible for conducting any examination or interview of Plaintiff on the occasions he has attended sick call or otherwise appeared in the health care unit at Easterling seeking medical treatment. (Id.). Those tasks were assigned to other members of the medical staff at Easterling. (Id.).

Based upon Nurse Wilson's understanding of Plaintiff's complaints of back pain (both past and present) and the examinations and treatment he has received as of this date, it is evident that Plaintiff has received timely and appropriate medical care. (Wilson Aff. at ¶ 9).  Nurse Wilson has not at any time ignored any request by Plaintiff for medical treatment. (Id.).  Nurse Wilson has not deliberately ignored Plaintiff's medical complaints or refused to provide Plaintiff with any necessary medical treatment. (Id.).  Nurse Wilson has not taken any action which has caused Plaintiff to experience any unnecessary pain and/or suffering.  (Id.).

## ARGUMENT

As a general matter, injunctive relief is "to be used sparingly, and only in a clear and plain case."  See Rizzo v. Goode, 423 U.S. 362, 378, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) (internal quotation omitted).  In the context of constitutional claims, injunctive relief may only be used as a remedial measure to place persons in "the position they would have occupied in the absence of such conduct." Milliken v. Bradley, 433 U.S. 267, 280, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977) (Milliken II) (internal quotation marks omitted).[5]  When courts consider claims for injunctive relief against governmental entities, a heightened scrutiny applies and there is no reason to ignore such a standard given the Medical Defendants' performance of duties on behalf of the State of Alabama.

When a government agency is involved, the Supreme Court has mandated that the government be granted the "widest latitude in the dispatch of its own internal affairs" because of federalism concerns.  Rizzo, 423 U.S. at 378-79 (citations omitted); O'Shea v. Littleton, 414 U.S. 488, 499, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974) ("proper balance in the concurrent operation of

---

[5]     The principles from the school desegregation cases are fully applicable in prison cases. See Hutto v. Finney, 437 U.S. 678, 687 n. 9, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) (discussing Milliken II and Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971), as applicable to Eighth Amendment case.

federal and state courts counsels restraint against the issuance of injunctions against state officers").   Accordingly, injunctive relief is appropriate only when "irreparable injury" is threatened, City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983), and any injunctive relief awarded must avoid unnecessary disruption to the state agency's "normal course of proceeding."   O'Shea, 414 U.S. at 501.  The United States Supreme Court voiced particular concern in the context of injunctive claims against correctional officials and/or systems, warning courts to leave correctional management to "the legislature and prison administration." See Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).  The narrow circumstances warranting the entry of injunctive relief are reflected in the requisite elements of proof necessary to obtain such relief.

The requisite elements of proof for entry of a preliminary are "essentially the same" as for a permanent injunction except that a plaintiff seeking a preliminary injunction must demonstrate a likelihood of success on the merits.  Siegel v. Lepore, 234 F. 3d 1163, 1213 (11th Cir. 2000) (en banc)(citing Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)).  In Klay v. United Healthgroup, Inc., the Eleventh Circuit restated the four-prong test to determine whether a preliminary injunction should be issued. 376 F. 3d 1092, 1097 (11th Cir. 2004); Siegel, 234 F. 3d at 1176 ; Frio Ice, S.A. v. Sunfruit, Inc., 918 F. 2d 154, 159 (11th Cir. 1990).

According to Klay and Siegel, Plaintiff must establish each of the following elements of proof:

> (1)     a likelihood of success on the merits;
>
> (2)     a continuing irreparable harm if the injunction is not granted;

> (3)     the threatened harm to the Plaintiff outweighs any harm
> that the injunction may cause the ADOC and/or the
> Medical Defendants; and
>
> (4)     the public interest will not be disserved by the grant of a
> permanent injunction.

Klay, 376 F. 3d at 1097; Siegel, 234 F. 3d at 1176.  Accordingly, Plaintiff is not entitled to any injunctive relief unless he has "clearly establish[ed] the burden of persuasion as to *each* of the four prerequisites."   Wall v. Ferrero, 142 Fed. Appx. 405, 407 (11th Cir. 2005) (citing McDonald's Corp. v. Robertson, 147 F. 3d 1301, 1306 (11th Cir. 1998)).

As demonstrated below, Plaintiff's Motion for Preliminary Injunction is devoid of any evidentiary justification and/or legal basis.

### A.    PLAINTIFF FAILED TO DEMONSTRATE ANY LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS § 1983 CLAIM.

Plaintiff's dissatisfaction with the medical treatment provided by the Medical Defendants and the absence of any specific medical evidence regarding the cause of his alleged back pain or any grounds to provide a different course of treatment of his back pain does not automatically equate an Eighth Amendment claim brought pursuant to 42 U.S.C. § 1983.  The evidence presented by Medical Defendants clearly establishes that: (1) in response to every complaint voiced by Plaintiff, Dr. Darbouze undertook an evaluation of Plaintiff's complaints, ordered diagnostic testing, provided medication and continued to monitor his condition to attempt to confirm the current diagnosis of his back pain as muscular pain; and (2) Nurse Wilson was not involved in any way in the medical care sought or received by Plaintiff.  Moreover, Plaintiff does not allege in his Complaint that he did not receive any medical treatment or attention for his complaints of back pain.  Plaintiff's Complaint does not identify any specific instance when he requested medical treatment and any of the Medical Defendants refused to provide him with any necessary medical treatment.  In sum, Plaintiff simply claims that he was dissatisfied with the

20

specific treatment prescribed for him and the manner in which such treatment was provided.  For these reasons and the reasons stated below, Plaintiff cannot demonstrate any likelihood of succeeding on the merits of his claim for deliberate indifference against Medical Defendants.

On the face of his Complaint, Plaintiff acknowledges that his claims against the Medical Defendants sound solely in terms of deliberate indifference pursuant to "42 U.S.C. Section 1983." (Complaint at ¶ 2).  In fact, Plaintiff writes, "[t]he deliberant indifference by Defendants to Plaintiff's serious medical need resulted in continued pain, suffering, and physical degradation of Plaintiff's condition depriving him of his rights under due process clause of the Fourteenth Amendment and Eighth Amendment[6] of the U.S. Constitution." (Complaint at ¶ 20).    The Eighth Amendment does not on its face reference in any way any medical care due to incarcerated persons. See e.g. Marsh v. Butler County, Ala., 268 F. 3d 1014, 1038 (11th Cir. 2001)(en banc).  In Estelle v. Gamble, 429 U.S. 97(1976), the United States  Supreme Court first inferred a prisoner's "right" to necessary medical care from the text of the Eighth Amendment. In reaching this conclusion, the Estelle Court held that the prohibition against cruel and unusual punishment in the Eighth Amendment prohibits prison officials from acting with "deliberate indifference" with regard to prisoners' serious medical needs. 429 U.S. at 104.  Since Estelle, courts have routinely recognized that the Eighth Amendment[7] to the United States Constitution governs the conditions of confinement for prisoners and the treatment of these prisoners during

---

[6]    Notably, the Eighth Amendment applies to the states by virtue of the Fourteenth Amendment's Due Process Clause. Robinson v. California, 370 U.S. 660, 666 (1962).

[7]    Though liability arising out of the treatment of pretrial detainees triggers Fourteenth Amendment considerations, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner . . ." See Hamm v. DeKalb County, 774 F.2d 1567, 1573-74 (11th Cir. 1985).  To the extent Medical Defendants rely upon any cases addressing the application of the Fourteenth Amendment in the prison context, such cases are equally applicable in this case.

the term of their incarceration.  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)); see also Whitley v. Albers, 475 U.S. 312, 327 (1986); Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981).

An alleged claim of "deliberate indifference" under the Eighth Amendment may be actionable under 42 U.S.C. § 1983.[8]  See Graham v. Connor, 490 U.S. 386, 393- 94 (1989)(recognizing that § 1983 is not a source of "any substantive right," but rather provides a means for "vindicating federal rights elsewhere conferred."). Every claim by a prisoner that he has not received adequate medical treatment does not state a violation of the Eighth Amendment. McElligott v. Foley, 182 F. 3d 1248, 1254 (11th Cir. 1999).   Courts have devoted an extraordinary amount of time clearly defining the requirements for asserting and succeeding upon an Eighth Amendment claim under § 1983.  Both the Supreme Court and Eleventh Circuit have described the Eighth Amendment standard of deliberate indifference as requiring allegations and evidence of both "objective" and "subjective" components. See e.g. Farmer, 511 U.S. 825 at 834, 837; Chandler v. Crosby, 379 F. 3d 1278, 1289-90 (11th Cir. 2004).

The "objective" component of the Eighth Amendment analysis requires a prisoner to demonstrate the existence of a condition, act or omission which is sufficiently egregious to violate the Eighth Amendment.  See Hudson v. McMillian, 503 U.S. 1, 8 (1992).  The underlying conduct or condition must be "extreme" and pose "an unreasonable risk of serious damage to his future health," if left unchecked. Chandler, 379 F. 3d at 1289-90 (quoting Hudson, 503 U.S. at 9)

---

[8]     42 U.S.C. § 1983 provides, in pertinent part,

    Every person who, under color of any statute, ordinance, regulation, custom, or
    usage, of any State of Territory or the District of Columbia, subjects, or causes to
    be subjected, any citizen of the United States or other person within the
    jurisdiction thereof to the deprivations of any rights, privileges, or immunities
    secured by the Constitution and laws, shall be liable to the party injured in an
    action at law, suit in equity, or other proper proceedings for redress . . . .

(other citations omitted).  At a minimum, a prisoner must allege and establish the existence of "a serious medical need." Chandler, 379 F. 3d at 1289-90; Farrow v. West, 320 F. 3d 1235, 1243 (11th Cir. 2003).  The Eleventh Circuit's long-standing definition of "serious medical need" is a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See e.g. Farrow, 320 F. 3d at 1243 (citing Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F. 3d 1176, 1187 (11th Cir. 1994) (internal quotations omitted)).  Additionally, the serious medical need must be such that, if left untreated, "pos[es] a substantial risk of serious harm." Farmer, 511 U.S. at 834. The burden falls squarely upon Plaintiff to allege and ultimately establish the existence of a serious medical need.  See e.g. Hamm v. DeKalb County, 774 F. 2d 1567 (11th Cir. 1985).

Given the allegations in Plaintiff's Complaint, he fails to provide the Court with any specific grounds to conclude that Plaintiff's complaints of back pain constitute a "serious medical need." (See Complaint).  At a minimum, Plaintiff alleges that he is experiencing muscular back pain.  It can hardly be said that any experience involving muscular pain rises to the level of a "serious medical need."  More specifically, it can hardly be said that muscular pain constitutes a condition which, if not treated, would pose a "substantial risk of serious harm" to Plaintiff.  Based upon the various tests and examinations ordered by Dr. Darbouze and the lack of any specific medical evidence indicating that Plaintiff's complaints of back pain originate from some significant medical condition, there is no basis to conclude Plaintiff was identified a serious medical need. (See Darbouze Aff.).  While the medical staff at Easterling has demonstrated a concern and attention to Plaintiff's Complaints, there is no evidence, medical or otherwise, of any kind to suggest that his current complaints of muscular back pain rise to the level of a "serious medical need," which is actionable under § 1983.

Even if Plaintiff's muscular back pain rises to the level of a serious medical need for purposes of a § 1983 claim, he must also establish the "subjective" component of an Eighth Amendment violation.  Plaintiff must prove the Medical Defendants acted with "deliberate indifference." See e.g. Farmer, 511 U.S. at 837.  This subjective component requires evidence the Medical Defendants possessed actual knowledge of "an excessive risk to inmate health or safety" and disregarded that risk. Id. at 837.  Evidence demonstrating Medical Defendants failed "to alleviate a significant risk that [they] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" or serve as a basis for a claim of deliberate indifference. Burks v. Sikes, 169 F. 3d 1353, 1363-1364 (11th Cir. 1999)(other citations omitted); see also Cottrell v. Caldwell, 85 F. 3d 1480, 1491 (11th Cir. 1996) (holding, "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not ....'" (quoting Farmer, 511 U.S. at 838)). Courts summarize this component as requiring evidence of a "subjectively sufficiently culpable state of mind." Id. at 1491 (other citations and internal quotations omitted).

It is incumbent upon a prisoner asserting a § 1983 claim to establish "conscious or callous indifference" on the part of the prison official.  See e.g. Daniels v. Williams, 474 U.S. 327 (1986); Brown v. Hughes, 894 F. 2d 1533, 1537-38 (11th Cir. 1990).  For example, a prisoner's § 1983 claim for inadequate medical treatment cannot survive summary judgment unless and until the inmate produces evidence "of the prison official's subjective awareness" of the alleged medical condition and an "intentional refusal [by the official] to provide . . . care." Id.; Campbell v. Sikes, 169 F. 3d 1353, 1364 (11th Cir. 1999) (quoting Steele v. Shah, 87 F. 3d 1266, 1269 (11th Cir. 1996)); Hill, 40 F. 3d at 1186).  Without evidence of this "specific intent," a prisoner's § 1983 claim cannot succeed.  Steele, 87 F. 3d at 1269.

Courts have devoted a significant amount of time identifying the specific types of allegations which do *not* give rise to the claim of "deliberate indifference." In declaring the "deliberate indifference" standard for the first time, the <u>Estelle</u> Court wrote, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." 429 U.S. at 106. The Eleventh Circuit in <u>Chandler</u> held a prisoner's discomfort does not give rise to an Eighth Amendment violation. 379 F. 3d at 1295 (citations omitted). Applying <u>Estelle</u>, the Eleventh Circuit also noted that a complaint that prison medical staff should have done more to diagnose and/or treat a prisoner is "at most . . . medical malpractice." <u>Campbell</u>, 169 F. 3d at 1363. Indeed, the Eighth Amendment does not prohibit or provide any remedy for any "accidental inadequacy . . . or even medical malpractice actionable under state law." <u>Taylor v. Adams</u>, 221 F. 3d 1254, 1258 (11th Cir. 2000) (quotations and citation omitted). For this reason, medical decisions not to or when to provide certain types of medical treatment, such as an x-ray, are not actionable as a matter of law under the Eighth Amendment. <u>Id.</u>

In instances when inmates acknowledge treatment but contest the manner in which treatment is provided, courts have applied an altered analysis of claims involving requests for different or alternative types of medical treatment. When an inmate claims "different treatment should have been provided," such a claim "is tantamount to a medical judgment call," not an Eighth Amendment violation. <u>McElligott</u>, 182 F. 3d at 1259. In greater detail, the Eleventh Circuit explained in <u>Hamm</u>:

> Although Hamm may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference. <u>See</u> <u>Bass v. Sullivan</u>, 550 F. 2d 229, 231-32 (5th Cir.), <u>cert. denied</u>, 434 U.S. 864, 98 S. Ct. 195, 54 L. Ed. 2d 138 (1977); <u>accord</u>, <u>Westlake v. Lucas</u>, 537 F. 2d 857, 860 n. 5 (1st Cir. 1981) (**"Where a prisoner has received ... medical attention and the dispute is**

> *over the adequacy of the treatment, federal courts are generally*
> *reluctant to second guess medical judgments and to*
> *constitutionalize claims that sound in tort law*.").

774 F. 2d at 1575 (emphasis supplied).

In this instance, Plaintiff claims medical care and/or attention was not provided to the degree or extent expected by Plaintiff. (<u>See</u> Complaint).  In his Complaint, Plaintiff fails to identify any act or omission of any Medical Defendant which would suggest any "intentional refusal [by any Medical Defendant] to provide . . . care."  To the contrary, Plaintiff's medical records demonstrate that Plaintiff has received significant attention and medical treatment from the medical staff and, in particular, Dr. Darbouze, in their attempts to confirm the cause of his purported back pain.

After Plaintiff complained of lower back pain in January of 1995, he did not voice any other complaints of back pain to the medical staff at any ADOC facility for a period of approximately 10 years, despite numerous other medical complaints made during this approximate 10-year span.  (Darbouze Aff. at ¶¶ 4 and PHS028, 30, 32, 33, 35, 36, 40, 42, 43, 45, 46, 47, 48, 50-52, 84-88).  Though Plaintiff's complaints of lower back pain arose again in November and December of 1995, his complaints ceased again for approximately 18 months. (Darbouze Aff. at ¶¶ 6, 7, 9, 10 and PHS005, 9, 13, 25-26, 58, 111).  In every instance prior to 2007, when Plaintiff complained of back pain, the medical staff, evaluated his condition, prescribed medication, if appropriate, and ordered imaging studies.  There is no evidence that Plaintiff ever voiced any complaints or requested any necessary medical treatment prior to 2007 and did not receive a timely and appropriate response from the medical staff at Easterling.

Like the period of time prior to 2007, Plaintiff's renewed complaints of lower back pain over the course of the last three (3) months have been met with appropriate responses by the medical staff at Easterling, including Dr. Darbouze.  Since May 2, 2007, Plaintiff has submitted

six sick call request forms regarding back pain, at least two of which were submitted in close proximity in time and addressed during one sick call. (Darbouze Aff. at ¶¶ 10-11,13, 19 and PHS016, 18, 19, 21, 22, 24). In response to these sick call request forms, Plaintiff attended sick call on three occasions. (Darbouze Aff. at ¶¶ 11-12, 15, 21-23 and PHS011, 15, 17, 20, 21, 23). Plaintiff failed to report to the health care unit on at least two occasions when summoned by the medical staff for evaluation. (Darbouze Aff. at ¶¶ 10, 19 and PHS092, 101). Dr. Darbouze has examined Plaintiff on four occasions since May 2, 2007, and Plaintiff refused a fifth appointment with Dr. Darbouze. (Darbouze Aff. at ¶¶ 12, 16, 17, 22, 24, 27 and PHS008, 010, 11, 12, 15, 91, 95). Over the course of the last 3 months, Plaintiff has received orders from Dr. Darbouze for medication, including Naprosyn, Robaxin, Flexeril, Motrin and Tylenol, Benjay muscle ointment, crutches, x-rays, profiles ordering him to utilize a bottom bunk only, to avoid standing and to avoid any work activities. (Darbouze Aff. at ¶ 11-12, 15, 16, 20, 22, 25, 27 and PHS002-4, 12,  23, 53, 55, 89-90, 93, 96, 100). Probably, most importantly, Plaintiff has undergone x-rays of his lower back on November 21, 2005, June 12, 2007 and July 2, 2007. (Darbouze Aff. at ¶¶ 8, 18, 27, 28 and PHS002-4, 73, 82-83). None of these x-rays provided Dr. Darbouze with any medical evidence that Plaintiff's complaints of back pain result from anything other than muscular pain. (Id.). This evidence alone flies in the face of any contention that Dr. Darbouze acted with deliberate indifference or callous disregard towards Plaintiff's complaints or otherwise took or failed to take any steps necessary to properly address Plaintiff's complaints.

The plain and simple fact remains that there is no medical evidence indicating that Dr. Darbouze has (1) identified any specific cause of Plaintiff's complaints of back pain other than muscular pain, and (2) the medical treatment provided to Plaintiff for this muscular pain is inappropriate in any way. (Darbouze Aff. at ¶ 29). Dr. Darbouze's examinations of Plaintiff

have not revealed any skeletal or neurological problems which would indicate that his back pain is caused by a malformation or disease of his spine. (Darbouze Aff. at ¶ 29). At most, Plaintiff's Complaint constitutes a generalized set of grievances pertaining to the elective course of treatment prescribed by Dr. Darbouze and such claims, i.e. claims of medical malpractice and/or differences in medical opinion, do not constitute a basis to bring any Eighth Amendment claims.

Finally, while it is evident Dr. Darbouze has interacted with Plaintiff regarding his complaints of back pain and provided treatment for these complaints, there is no comparable evidence pertaining to the involvement of Nurse Wilson. First and foremost, Nurse Wilson, as a registered nurse licensed to practice in the State of Alabama, is not even qualified to provide the type of treatment requested by Plaintiff. (Wilson Aff. at ¶ 4). Second, Nurse Wilson's interaction with Plaintiff regarding his complaints of back pain has been limited to providing responses to one grievance form completed by Plaintiff and received by Nurse Wilson in June of 2007. (Wilson Aff. at ¶ 6). In the grievance form completed by Plaintiff, he complained of back pain and requested a wheelchair and an appointment with a specialist. (Id.). Plaintiff also requested "profiles," which are orders provided by the site physician which allow an inmate to deviate from the standard operating procedures at Easterling. (Id.). In particular, Plaintiff requested a profile from the site physician which ordered him to avoid standing or working and allowed him to use the handicap-accessible shower facility at Easterling. (Id.). When Nurse Wilson received Plaintiff's first grievance, she promptly reviewed his file and noted that he had been evaluated by Dr. Darbouze within the last week and that Plaintiff had received crutches and a bottom bunk profile from Dr. Darbouze during his last appointment. (Id.). Nurse Wilson also confirmed that Plaintiff had recently submitted a sick call request form and was scheduled for evaluation during the upcoming sick call. (Id.). Given Nurse Wilson's review of his medical

records and the notes from his recent appointment with Dr. Darbouze, it did not appear to Nurse Wilson that Plaintiff's back pain was a medical emergency at that time or that there was anything additional that Nurse Wilson could contribute to the treatment of his back pain, which was not being provided and/or would be provided at the upcoming sick call. (Id.).

Nurse Wilson has not been responsible for conducting any examination or interview of Plaintiff on the occasions he has attended sick call or otherwise appeared in the health care unit at Easterling seeking medical treatment. (Id.). Those tasks were assigned to other members of the medical staff at Easterling. (Id.). Given the lack of involvement of Nurse Wilson, there is likewise no basis to conclude that Plaintiff can maintain any claim against her for deliberate indifference to his alleged "serious medical need."

Based upon the foregoing, Plaintiff has not and cannot demonstrate any likelihood of success on the merits of his claim for deliberate indifference.

### B. THERE IS NO EVIDENCE, MEDICAL OR OTHERWISE, THAT PLAINTIFF WILL BE IRREPARABLY HARMED IF AN INJUNCTION IS NOT ISSUED.

The Eleventh Circuit has expressly stated that a violation of constitutional rights does not always constitute irreparable harm. Siegel v. LePore, 234 F. 3d 1163, 1177 -78 (11th Cir. 2000); KH Outdoor, LLC v. City of Trussville, 2194506, at *7-8 (11th Cir. August 4, 2006); Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville, 896 F. 2d 1283, 1285 (11th Cir. 1990) ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."); Cunningham v. Adams, 808 F. 2d 815, 821-22 (11th Cir. 1987) (affirming denial of preliminary injunction in action alleging Fourteenth Amendment violations, and finding no abuse of discretion in district court's rejection of the plaintiff's argument that "irreparable injury will be

presumed where there has been a violation of substantive constitutional rights"); see also Hohe v. Casey, 868 F. 2d 69, 73 (3d Cir. 1989) ( "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.").  Accordingly, even if Plaintiff demonstrated a likelihood of success on the merits, such a demonstration does not satisfy this second element required for the issuance of a preliminary injunction.

In his Motion for Preliminary Injunction and his corresponding Memorandum, Plaintiff acknowledges his inability to demonstrate that a preliminary injunction is necessary to avoid any irreparable harm to him.  Though Plaintiff may be concerned that his condition *may* worsen, such a contention is pure speculation.  (Motion for Preliminary Injunction at ¶ 2).  Plaintiff further alleges that a preliminary injunction is necessary to ensure that he receives a wheelchair, profiles allowing him to deviate from the protocols in place at Easterling, consultation with a specialist and/or "treatment."   (Motion for Preliminary Injunction at p. 3).  However, Plaintiff does not produce any evidence, medical or otherwise, demonstrating that, in the absence of intervention by the Court, his condition will be impacted in any way.  Given the history of his condition, it is possible that continuing the current course of treatment may actually result in an improvement of his condition.   Finally,  though  Plaintiff  claims  that  an  injunction  is  necessary  to  avoid "retaliation," there is no evidence of any kind (or even a scant suggestion by Plaintiff) that anyone has taken any action against him in retaliation for filing this action.

Given the entirely speculative nature of Plaintiff's argument that he will be harmed in the event injunctive relief is not granted in this action, Plaintiff's Motion for Preliminary Injunction is due to be denied.

C. THE INTERVENTION BY THE COURT IN THE MEDICAL DECISIONS REGARDING THE CARE TO INMATES PLACED **ADOC** AND THE MEDICAL DEFENDANTS IN A POSITION OF HARM AND THE PUBLIC INTEREST WILL NOT BE SERVED THROUGH THE ISSUANCE OF ANY PRELIMINARY INJUNCTION IN THIS MATTER.

Throughout the past six years and beyond, Alabama inmates have initiated lawsuits, including class action suits, seeking in many respects medical care of their choosing. As time has passed, the demands of inmates have continued to deviate more and more from the Eighth Amendment standard of deliberate indifference to a standard of inmate-directed correctional medicine. This case is clear evidence of the inmate population's prevailing, but misguided belief that they can file a lawsuit, assert claims without evidentiary support and ultimately obtain the medical care of their choosing. Indeed, this case demonstrates that inmates are ready and willing to pursue claims that would not even support a claim of medical malpractice. In the end, Plaintiff is seeking medical care which far exceeds the medical care available to a majority of Alabamians.

Plaintiff is well-aware that any preliminary injunctive relief in his favor in this case would detrimentally impact the ADOC Officials, the ADOC system, Medical Defendants and the public interest in general. Any preliminary injunction in this matter would demonstrate to Plaintiff, regardless of lack of medical education or training, that he is entitled to direct his own medical care, choosing which specialists he sees, choosing what types of medications he receives and demanding an absolute cure for conditions that cannot be cured.

While the State of Alabama and the ADOC continue to strive to provide excellent medical care to all of the inmates in their custody, it is legally inappropriate for Plaintiff to attempt to impose a standard upon the ADOC and the Medical Defendants which far exceeds the standard set forth in Estelle. For these reasons, the Medical Defendants request that the that medical care be left to the members of the medical staff at Easterling, not Plaintiff.

**D.    PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF DOES NOT COMPLY WITH CONSTRAINTS OF THE PRISON LITIGATION REFORM ACT.**

When inmates seek prospective injunctive relief, as Plaintiff requests in this matter, such a request is explicitly subject to and restricted by 18 U.S.C. § 3626.  Section 3626 of the Prison Litigation Reform Act ("PLRA") imposes limitations upon the types and extent of equitable relief afforded to inmates in various contexts.  With regard to prospective injunctive relief, 18 U.S.C. § 3626(a)(2) provides, in pertinent part:

> . . . Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. . . . .

According to this provision of the PLRA, the relief sought by Plaintiff must be narrowly tailored to achieve the desired result and constitute the "least intrusive means to correct the harm."  First and foremost, Plaintiff does not allege that there is any available medical treatment or procedure which would "cure" or resolve his current complaints of back pain. The various types of relief requested by Plaintiff, i.e. a wheelchair, specialist consultation, etc., would result in a dramatic intrusion into the medical evaluation, consideration and decision-making process with regard to Plaintiff's medical condition and is hardly the type of "narrowly tailored" relief permitted by the PLRA.  In short, Plaintiff requests that this Court order a myriad of medical treatment which may or may not impact in any way his complaints of back pain.  According to the PLRA, this type of unlimited provision of self-directed medical services is not constitutionally required or available to inmates through a request for injunctive relief.   Therefore, the requested preliminary injunctive relief requested by Plaintiff is due to be denied.

## CONCLUSION

Based upon the foregoing, Defendants DR. JEAN DARBOUZE and KAY WILSON, RN

respectfully request that this Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

s/ William R. Lunsford
One of the Attorneys for Dr. Jean Darbouze and Kay
Wilson, RN

**OF COUNSEL:**

William R. Lunsford
Maynard, Cooper & Gale, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
Telephone:  (256) 551-0171
Facsimile: (256) 512-0119
Email: blunsford@maynardcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of August, 2007, I electronically filed the foregoing

with the Clerk of the Court and mailed via regular U.S. mail or via electronic mail (as designated

below) to the following:

Barry Randall Thomas
AIS # 178628
Easterling Correctional Facility
200 Wallace Drive
Clio, AL 36017-2613

Tara S. Knee (*via electronic mail*)
Alabama Department of Corrections
Post Office Box 301501
Montgomery, AL 36130-1501

s/ William R. Lunsford
Of Counsel